IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

REVETTA J. TREMAIN,                  )
                                     )
            Plaintiff,               )
                                     )
      v.                             )  Case No.
                                     )  09-4239-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
            Defendant.               )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Revetta Tremain seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ
improperly discounted her subjective complaints and failed to
properly utilize the testimony of the vocational expert. I find
that the substantial evidence in the record as a whole supports
the ALJ's finding that plaintiff is not disabled. Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

*I.  BACKGROUND*

On February 28, 2007, plaintiff applied for disability
benefits alleging that she had been disabled since December 5,
2006. Plaintiff's disability stems from joint pain. Plaintiff's
application was denied on April 27, 2007. On February 12, 2009,
a hearing was held before an Administrative Law Judge. On March

26, 2009, the ALJ found that plaintiff was not under a
"disability" as defined in the Act.  On September 18, 2009, the
Appeals Council denied plaintiff's request for review.
Therefore, the decision of the ALJ stands as the final decision
of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.

<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.

2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

*IV.*   *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Vincent Stock, in addition to documentary evidence admitted at the hearing.

*A.*   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1977 through 2007:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1977 | $ 2,286.34 | 1993 | $ 1,078.00 |
| 1978 | 1,323.19 | 1994 | 1,005.00 |
| 1979 | 1,175.47 | 1995 | 157.35 |
| 1980 | 1,572.74 | 1996 | 10,245.00 |
| 1981 | 7.97 | 1997 | 19,292.71 |
| 1982 | 0.00 | 1998 | 21,306.79 |
| 1983 | 7.50 | 1999 | 22,017.27 |
| 1984 | 0.00 | 2000 | 8,699.39 |
| 1985 | 16.28 | 2001 | 6,580.81 |
| 1986 | 3,123.57 | 2002 | 14,758.83 |
| 1987 | 7,068.21 | 2003 | 6,035.84 |
| 1988 | 2,416.55 | 2004 | 5,735.56 |
| 1989 | 4,822.95 | 2005 | 14,371.05 |
| 1990 | 1,288.00 | 2006 | 15,684.98 |
| 1991 | 1,019.50 | 2007 | 411.88 |
| 1992 | 1,096.00 | | |

(Tr. at 104).  Plaintiff had no earned income in 2008 or 2009
(Tr. at 109).

**Function Report**

In a Function Report dated March 27, 2007, plaintiff
described her day as follows:

> Get out of bed, go to bathroom, get a drink, turn on TV, get
> something to eat, take medicine, take nap, get out of bed,
> watch TV, eat a snack, take med., brush teeth, fix hair
> (ponytail), watch TV, take nap, get up, go to bathroom, turn
> on TV, go to bed.

(Tr. at 131).

Plaintiff does not need reminders to take her medicine or to
take care of personal needs and grooming (Tr. at 133).  Plaintiff
prepared meals once every day or two (Tr. at 133).  She eats
sandwiches and frozen meals (Tr. at 133).  She can do laundry or
cleaning for about 20 minutes at a time (Tr. at 133).

Plaintiff is able to go out alone (Tr. at 134).  She drives
or rides in a car (Tr. at 134).  She shops for groceries once a
week for ten to 20 minutes (Tr. at 134).  She visits and talks on
the phone (Tr. at 135).

**B.   *SUMMARY OF MEDICAL RECORDS***

On December 5, 2006, plaintiff went to the emergency room
after falling three to four feet when she tripped while unloading
a truck (Tr. at 178-188, 200-207).  At the time she was smoking
five cigarettes a day.  Plaintiff had painless range of motion in

her neck.  X-rays of her left wrist, left hand, and right knee were all normal.  She was diagnosed with wrist, hand and knee contusions.

On January 25, 2007, plaintiff had an MRI of her lumbar spine due to low back pain stemming from her December 2006 fall (Tr. at 189).  Neal Meyer, M.D., found that plaintiff had mild broad bulge,[1] slightly eccentric lateral right at L5-S1 with some mild neuraforaminal spurring; mild facet changes of L4-5; and no additional gross compromise to the spinal canal or exiting nerve roots.  That same day, plaintiff had an MRI of her right knee, again related to her fall (Tr. at 190).  Dr. Meyer found a small joint effusion (accumulation of fluid) with no acute ligamentous

---

[1]"Bulge" describes a morphologic characteristic of various possible causes.  Bulge is a term for an image that requires a differential diagnosis.  Bulging is sometimes a normal variant (usually at L5-S1); can result from advanced disc degeneration or from vertebral body remodeling (as consequent to osteoporosis, trauma, or adjacent structural deformity); can occur with ligamentous laxity in response to loading or angular motion; can be an illusion caused by posterior central sub-ligamentous disc protrusion; or can be an illusion from volume averaging (particularly with CT axial images).  Bulging, by definition, is not a herniation.  Herniation is present if there is localized displacement of disc material, and not simply outward overlapping, as is the case with some types of bulging.  Application of the term "bulging" to a disc does not imply any knowledge of etiology, prognosis, need for treatment or necessarily imply the presence of symptoms.  http://www.asnr.org/spine_nomenclature/discussion.shtml, American Society of Neuroradiology, American Society of Spine Radiology and North American Spine Society.

or meniscal[2] injury of the right knee.

On September 12, 2007, plaintiff was examined by Steven Adelman, Psy.D., at the request of the Division of Family Services (Tr. at 282-284). Plaintiff reported she had been arrested one time in her life for writing bad checks. Plaintiff's memory functions were within normal limits including long-term memory. Dr. Adelman assessed major depressive disorder, moderate with recurring symptoms, Rule out hypochondria. Her GAF was 45. "[S]he may possibly be a hypochondriac. It is unknown if all of the medical problems she reported[3] are actually real and can be confirmed with a physician; however, she does perceive pain and it appears that this pain has impaired her and kept her from working."

On November 13, 2007, a radiologist took five views of plaintiff's cervical spine due to complaints of back and leg pain (Tr. at 214, 246). He found no acute abnormality but

_____

[2]Three bones meet to form the knee joint: the thighbone (femur), shinbone (tibia), and kneecap (patella). Two wedge-shaped pieces of cartilage act as "shock absorbers" between the thighbone and shinbone. These are called meniscus. They are tough and rubbery to help cushion the joint and keep it stable.

[3]"She says she has a history of physical and sexual abuse. She said she has a lack of confidence and indicated that she may be hypervigilant. She believes she is dying. She has right and left knee problems. She has wrist problems. She said she has spine spurs. She has dull aching and lower back pain. She has inflammation in the higher portion of her back. She indicated she has tumors in her stomach. She has a thyroid condition. She has migraines and she has an inner ear infection." (Tr. at 282).

degenerative changes resulting in neural exit foraminal narrowing at the C5-67 and C6-7 levels.

On November 20, 2007, plaintiff had an MRI of her cervical spine due to complaints of pain (Tr. at 210, 243). Plaintiff had mild generalized disc bulge at C5-6 resulting in slight central canal stenosis (narrowing) and degenerative disc disease. Plaintiff also had an MRI of her lumbar spine resulting in a finding of small left paracentral protrusion at T11-12 without central canal or neural foraminal stenosis (narrowing), early degenerative disc disease at L5-S1, and an otherwise "unremarkable MRI of the lumbar spine." (Tr. at 242).

On November 30, 2007, plaintiff underwent a partial EMG test (Tr. at 244-245). "Patient refused low extremity EMG test. Normal right arm EMG, right arm and leg nerve conduction studies."

On February 13, 2008, plaintiff saw James Froncek, D.O., for a follow up on lab work (Tr. at 223). "The patient states that she weaned herself off of Duragesic patch because she heard so many things from the media and from her friends regarding potential side effects with the Duragesic patch. The patient relates increased pain and discomfort corresponding to her discontinuation of the Duragesic patch." Plaintiff's physical exam was normal. Dr. Froncek assessed chronic pain, "suspect

fibromyalgia", hypothyroidism and hyperlipidemia. Dr. Froncek recommended plaintiff see a pain management specialist. He prescribed Lyrica (treats nerve pain) with no refill and Naproxen (a non-steroidal anti-inflammatory) with no refill.

On February 14, 2008, plaintiff saw Manjamalai Sivaraman, M.D., a neurologist, with complaints of bilateral upper and lower extremity pain and tingling (Tr. at 250-255). Plaintiff told Dr. Sivaraman that she fell at work in 2006 and fractured her right knee. "Did not require surgery and since that day of accident, she has been having diffuse body pain, neck pain, lower back pain, pain in her knees, as well as in the extremities." Plaintiff was noted to be a "chronic smoker for 20 to 30 years, 1 pack per day." She reported that she quit smoking in December 2007. Plaintiff's physical and mental exam were normal except she had decreased pinprick sensation below the knees. She had normal tone and equal strength in all four extremities. "I suspect sensory polyneuropathy. However, her motor examination is normal at this time. . . . She does not have a focal motor deficit at this time. . . . History of migraines, under control for the past 2 years. . . . MRI of her cervical and lumbar spine revealed evidence of some degenerative changes, without any significant findings that explain her symptoms."

Dr. Sivaraman recommended blood work and increased plaintiff's dose of Lyrica. "I also believe that her hypo-thyroidism needs to be adequately controlled in order to avoid development of hypothyroidism-related medical conditions such as weight gain, sleep apnea, peripheral neuropathy, etc."

On March 5, 2008, plaintiff saw Dr. Froncek to discuss referrals "and wishes labs drawn in the office today." (Tr. at 221-222). "The patient states that she has talked to her attorney and he has asked for a physician's evaluation or rating of her pain. The patient relates inability to participate in physical therapy. The patient is having difficult time with strength in her lower extremities." Plaintiff's physical exam was normal. Dr. Froncek assessed lower extremity pain. "The patient has asked an opinion regarding pain in her legs. I explained to the patient that I am not an occupational or a pain management specialist and that if she was seeking this type of opinion regarding her pain then she needed to have this obtained through a specialist, either one of her choosing or one recommended by her attorney."

On April 2, 2008, plaintiff saw Dr. Froncek to have her thyroid hormone checked (Tr. at 219-220). Plaintiff asked for a B12 shot due to feeling weak and fatigued. "The patient states that she needs rating for workman's compensation. The patient

relates her blood sugars have been running high.  The patient
relates migraine headaches are back and that they are severe."
Plaintiff also said her significant other had witnessed episodes
of sleep apnea.  Plaintiff's exam was normal.  Dr. Froncek
assessed possible sleep apnea, chronic headaches, weakness and
fatigue.  He questioned her report of high blood sugars:
"Laboratory evaluation completed by neurologist, Dr. Sivaraman,
at University of Missouri, Columbia revealed the blood sugar to
be within the normal range at 94."  Dr. Froncek recommended
plaintiff take over-the-counter B vitamins, have a sleep study,
and have lab work to check her fasting blood glucose level.

On April 10, 2008, plaintiff saw Dr. Froncek to have moles
removed and to go over lab results (Tr. at 217-218).  "The
patient relates waiting to have a workman's compensation rating
provided to her.  The patient relates that her lawyer wishes me
to provide this information.  The patient relates just chronic
pain.  The patient does relate previous psychiatric history for
which she was disabled and evaluated by a psychiatrist in
Versailles and the patient relates that she was totally disabled
based upon this and does relate that the evaluation made
reference to her being hypochondriac. . . .  The patient does
still relate of debilitating back pain, overall neck pain, and
inability to sit for extended periods of time.  Review of Dr.

Abbott's assessment is the patient would be able to have a job where she sat as a cash register and lifting less than 5 pounds. The patient also relates a social security disability legal action pending through another attorney."

Plaintiff's physical exam was normal. He assessed, "Chronic pain, question subjective pain in degree of disability. Occupational specialist Dr. Abbott had the patient returning to work in a seated cashier's position lifting less than 5 pounds. The patient was subsequently discharged for lack of followup and not able to follow through on physical therapy as prescribed by Dr. Abbott. My determination as far as disability rating would be along the lines of what Dr. Abbott had recommended. I asked the patient if she would undergo physical therapy. The patient wholeheartedly refused this. I suggested the patient very well may be able to work and it would be worth trying the patient to work. However, the patient relates reluctance and resistance to working as well as the physical therapy and becomes quite anxious at hearing that my assessment would be that she could work."

Plaintiff reported she was taking Lyrica for pain "as needed." Dr. Froncek noted that he was not aware of Lyrica being an "as-needed" medication, that it should be taken regularly. He recommended she return in ten days and bring in all her medications for review, and that her worker's compensation rating

"needs to be done through an occupational medicine specialist."

On April 17, 2008, plaintiff underwent a sleep study at Lake Regional Health System under the direction of Dr. Sivaraman (Tr. at 193-198, 233-238, 270-271). The sleep study was performed due to complaints of daytime naps, fatigability and sleepiness. Dr. Sivaraman wrote, "She does require CPAP[4] therapy", and he recommended she lose weight.

On April 25, 2008, plaintiff saw Dr. Froncek for a follow up on pain medications (Tr. at 215-216). "The patient relates weaning herself off of Duragesic patch. The patient relates that she would like to have workman's compensation rating today; if she does not get this rating today that she is planning on finding a new physician. The patient's initial sleep study results were positive for significant obstructive sleep apnea. The patient did not have any subsequent followup test for titration. The patient relates she is not sleeping well. The patient states that she is hurting everywhere. The patient relates taking Lyrica [used to control nerve pain] just as needed and not on a scheduled basis. . . . The patient states the only pain medication that works for her is OxyContin [narcotic]."

---

[4]Continuous positive airway pressure therapy (CPAP) uses a machine to help a person who has obstructive sleep apnea breathe more easily during sleep. A CPAP machine increases air pressure in the throat so that the airway does not collapse when breathing in.

Plaintiff's exam was normal.  Dr. Froncek assessed the following:

1.    Chronic pain, question secondary gain.

2.    Obstructive sleep apnea.

3.    Hypothyroidism. . . .

4.    . . .  The patient has chronic pain, question
      neuropathic.[5]  The patient is taking Lyrica 300/600 mg
      just as needed.  The patient relates she is taking
      maybe once a day and not taking it on a regular basis.

5.    Sleep rhythm disturbance.

6.    Hyperlipidemia

Dr. Froncek prescription Synthroid [thyroid hormone],

Trazodone [antidepressant used as a sleep aid], Zocor [lowers

cholesterol], and Norco for pain.  He prescribed Lyrica for pain

and told plaintiff to take it on a regular basis.  Dr. Froncek

offered plaintiff a refill of Duragesic patch as Darvocet or

Tylenol No. 3 but plaintiff refused, "saying that the only

medication that works for her pain ins OxyContin.  I explained to

the patient OxyContin is an addictive drug, dangerous drug and

that in order to obtain OxyContin she will need to see a pain

management specialist".

No follow up was made because plaintiff said she would be

establishing care with a new physician:  "The patient requests

disability rating.  I explained to the patient disability rating

_____

[5]Neuropathic pain is produced by damage to or pathological
changes in the peripheral or central nervous systems.

15

is something that needs to be obtained through an occupational medicine specialist and that this involves specific amount of testing in terms of what she can or cannot do.  The patient does relate having been to doctors where she has witnessed doctors who have given ratings and told patients to appear in front of judge or a committee feigning illness.  I explained to the patient that I would not give her rating, be more than happy to describe her illness or situation.  However, in terms of getting her overall rating this needs to be done by a specialist.  The patient relates that if she does not get a rating today that she will seek another physician.  The patient relates her lawyer told her that a doctor who would not give her a rating is not a very good doctor and does not know what he is doing.  I explained to the patient that the rating is something that must be reproducible and needs to be done with thorough testing after obtaining records from all venues.  The patient refused to do physical therapy.  The patient has refused EMG testing.  The patient did have an appointment with Dr. Mace for evaluation.  However, the patient relates she disagreed with the payment mechanism by which Dr. Mace would receive a percentage of the disability the patient received and the patient refused to be seen to have a rating per Dr. Mace due to a billing issue."

On May 8, 2008, plaintiff saw F. Michael Schekorra, D.O., to establish care (Tr. at 266). She complained of back pain. Plaintiff was tender to palpation over the lumbar region. "Took a Hydrocodone in the waiting room." Dr. Schekorra told plaintiff he was "not going to prescribe any further pain pills. Will give script for Flexeril [muscle relaxer]. Has hydrocodone at home."

On June 23, 2008, plaintiff saw Dr. Sivaraman for a follow up (Tr. at 256-258).

> I suspected sensory polyneuropathy. She also suffers from significant hypothyroidism for which she was on levothyroxine. She stopped taking levothyroxine 5 days ago because she ran out of her prescription. She tells me that her primary care physician, Dr. Froncek, fired her because she was taking excessive amounts of Lyrica and she put on weight. Actually during last visit, I had increased her Lyrica to 150 mg 2 times a day to control distal paresthesias.

> In the meantime she was also diagnosed to have obstructive sleep apnea and did not undergo CPAP titration sleep study yet. Currently she has Medicaid, and she has not found another doctor to care for her. Currently she is not on any medications. She is supposed to be taking Topamax 25 mg at bedtime for migraine prevention, and she is not doing that either.

Dr. Sivaraman "strongly" recommended that plaintiff schedule an appointment with a primary care physician to control her hypothyroidism "which is the primary issue in her case and she has had significantly elevated TSH levels in the past. We talked about complications of untreated hypothyroidism including coma." Dr. Sivaraman gave plaintiff samples of Topamax and told her to

17

take it every day, and he also asked her to forward Dr. Froncek's records to him for review.

On July 24, 2008, plaintiff saw Dr. Schekorra reporting knee and back pain (Tr. at 265). Plaintiff indicated that she had been out of Simvastatin (lowers cholesterol) for a "long time". Dr. Schekorra ordered lab work, prescribed Simvastatin, and told plaintiff to repeat the blood work in 12 weeks.

On November 18, 2008, plaintiff was seen at Osage Beach Medical Park to establish care (Tr. at 276-278). "She is supposed to be on Lyrica at 200 mg three times a day but is only taking 100 mg a day. She does have chronic pain everywhere, muscle spasms in the shoulders, neck, and lower back. She is at this point unemployed as she is unable to perform any work after work-related injury 2 years ago that is currently in the courts. She did have a work compensation physician in the past who refuses to see her at this point. She is applying for disability at this time as well."

Plaintiff told this doctor that she had broken her knee in the past but did not need surgery, and that she had had a 9.7 pound tumor removed from her stomach at St. Mary's Hospital in Jefferson City. "She is a very poor historian and it is somewhat difficult to obtain a full evaluation what has actually gone on with her in the past." Plaintiff's physical exam was normal.

"Questionable neuropathy - The patient really needs to go back and see Dr. [Sivaraman], her neurologist."  She was assessed with "Depression - Questionable."  The doctor held off on starting an antidepressant "until the etiology is slightly clear."  Plaintiff did not remember who did her surgery to remove the 9.7-pound tumor or the pathology.  The doctor wrote, "questionable gastrointestinal tumor".  The doctor assessed osteoarthritis (after plaintiff said she had been so diagnosed in the past), "most likely related to her morbid obesity, but apparently these are the reasons that she is trying to obtain a disability at this time. . . .  I advised the patient to see a nutritionist at least to begin nutrition program, but the patient did reverse on this and she states she cannot afford anything at this time."

On February 23, 2009, plaintiff saw Dr. Sivaraman (Tr. at 54-56, 287-289).  Plaintiff complained of trouble using her wrists, finger gripping, and pain in her shoulders and knees.  Plaintiff had 4/5 muscle strength in both hands including finger grip, mild weakness of the left hip flexors, decreased pinprick in glove and stocking distribution and decreased cold sensation in the distal extremities.  "This is consistent with sensory polyneuropathy.[6]  The exact cause of this condition is still unclear."  Dr. Sivaraman recommended plaintiff have an EMG/nerve

---

[6]Disorder of the sensory nerves.

conduction study and see a neuromuscular specialist.  He
prescribed Neurontin and told her to taper off the Lyrica.  He
told her to continue taking Topamax for migraine prevention and
Flexeril for muscle cramps.

On April 8, 2009, plaintiff saw Niranjan Narain Singh, M.D.,
a neurologist (Tr. at 57-60, 290-293).  Plaintiff complained of
low back pain and leg pain since December 2007.  Plaintiff's pain
extended through her legs to her knees, was intermittent,
moderate to severe, nonradicular, and had no definite aggravating
or relieving factors.  "Sometimes she also notices a tingling
numbness in her fingers and toes."  Plaintiff complained of
weakness all over her body.  Dr. Singh reviewed previous tests
and performed an exam.  Plaintiff had 5/5 muscle strength in arms
and legs and no muscle atrophy.  She had normal sensory responses
to light touch, temperature, and vibration.  Dr. Singh assessed
possible lumbosacral radiculopathy and possible peripheral
neuropathy, small fiber.  He recommended she have EMG and nerve
conduction studies and a skin biopsy for small fiber neuropathy.

On May 8, 2009, plaintiff saw Dr. Singh for an EMG study
(Tr. at 61-63, 294-296).  "This is a normal study.  There is no
electrophysiological evidence of peripheral neuropathy.  The
lumbar radiculopathy can not be commented due to lack of EMG

information from muscles."  Plaintiff had refused the needle part
of the examination "due to previous painful experience."

## C.  *SUMMARY OF TESTIMONY*

During the February 12, 2009, hearing, plaintiff testified;
and Vincent Stock, a vocational expert, testified at the request
of the ALJ.

## 1.  **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 49 years of age
(Tr. at 25).  She has an 11th grade education (Tr. at 25).
Plaintiff weighs 200 pounds (Tr. at 31).  Plaintiff lived alone
in a double-wide mobile home (Tr. at 25).  She also has a trailer
she rented out for income (Tr. at 39).  Plaintiff last worked on
December 5, 2006, for Walgreens (Tr. at 26).  Plaintiff fell at
work that day and hurt her knees, wrists, low back, and shoulders
(Tr. at 26).  Plaintiff went to the emergency room and was told
she had a fractured right knee, spurs on her spine, and needed
wrist restraints and a long knee restraint (Tr. at 26).  She
filed a workers' compensation claim which was still pending at
the time of the hearing (Tr. at 38).  Plaintiff has four bulging
discs (Tr. at 27).  Plaintiff also suffers from sleep apnea (Tr.
at 27-28).  She was set to go to the doctor the following month
to see what kind of C-PAP machine she needed (Tr. at 28).

Plaintiff cannot work because if she uses her wrists for very long her fingers will swell (Tr. at 28). Her fingers get numb and tingle, and the swelling is so bad she is unable to bend her fingers (Tr. at 37). If she uses her hands for nothing at all, the swelling will go down (Tr. at 37). But if she even uses her hand to open a door, the swelling will come back (Tr. at 37). Her knees pop and crack and try to give out from underneath her (Tr. at 28). Even the air in the room will hurt her knees (Tr. at 29). She has neuropathy and cannot feel the pedals to drive a car (Tr. at 28). She cannot put her arms straight up over her head (Tr. at 38). She suffers from migraines about three times a week, and she has trouble with her memory because of her medications (Tr. at 29). Plaintiff is able to get her medications with Medicaid (Tr. at 30).

Plaintiff's friends come in and get her out of bed and put coffee on her table (Tr. at 30). She believes she can walk about 30 steps (Tr. at 30). On average, she could walk a maximum of three minutes (Tr. at 30). She can stand still a maximum of three to five minutes but has to be holding onto something or she will lose her balance and fall (Tr. a 30). The longer she sits, the more her back and shoulder muscles "ball up" and hurt (Tr. at 31). She can sit for a maximum of 30 minutes before needing to get up and walk around (Tr. at 31). Sometimes plaintiff can lift

five pounds; sometimes she cannot (Tr. at 31).

Plaintiff believes Oxycodone makes her swell, but she takes it when she can get her hands on it because she believes it is the one medication that helps her most with pain (Tr. at 32). Plaintiff's medications "numb" her pain (Tr. at 32). Plaintiff is not seeing a psychiatrist or a psychologist (Tr. at 32-33). She saw a psychiatrist in early 2007 for an evaluation at the request of the welfare office, but she has never seen anyone for mental health treatment and takes no medications for her mental condition (Tr. at 33). Despite that, plaintiff has trouble with depression (Tr. at 33). She is depressed over not being able to work, losing her license, and being broke all the time (Tr. at 33). She was alright the day of the hearing because she was able to get out and it left her little time to dwell on the fact that she does not have money to go to Wal-Mart or somewhere else that requires money (Tr. at 34).

On a bad day, plaintiff may not be able to make it to her chair, or she does nothing all day but go between her chair and her bed (Tr. at 34). Plaintiff has about three bad days per week (Tr. at 34). On a good day, she may lie down two or three times during the day (Tr. at 35). On a bad day she may not even get out of bed other than to take her medicine (Tr. at 35).

On a typical day, plaintiff will watch television, lie down, fix something to eat, try to straighten up the house (Tr. at 32). Plaintiff never lies down for more than an hour at a time (Tr. at 32). She shops for groceries but someone takes her (Tr. at 32).

Plaintiff was able to remember without difficulty the amount of weight she was required to lift at six different past jobs (Tr. at 41-42).

**2. Vocational expert testimony.**

Vocational expert Vincent Stock testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who is limited to performing light work; can occasionally climb ramps and stairs; can never climb ropes, ladders, or scaffolds; may occasionally balance, stoop, kneel, crouch, or crawl; can frequently (but not constantly)[7] reach in all directions; should avoid concentrated exposure to extreme cold, wetness, unprotected heights, vibration, and hazardous machinery; and is limited to performing simple unskilled tasks (Tr. at 43). The vocational expert testified that such a person could perform plaintiff's past relevant work as a cashier (Tr. at 43). The person could also perform her past relevant work as a piece worker as it is usually performed but not as she performed it (Tr. at 43). Both of these

---

[7]Constant use is 100% of the time. Frequent use is up to 66% of the time (Tr. at 46).

jobs require the person to use her hands (Tr. at 45).

The next hypothetical was the same as the first except the person was limited to sedentary work (Tr. at 43). The vocational expert testified that such a person could not do any of plaintiff's past relevant work (Tr. at 43). The person could, however, work as an assembly line fabricator, D.O.T. 739.684-094, with 3,000 jobs in Missouri and 120,000 in the nation (Tr. at 44). The person could also work as a wafer breaker, semiconductor, D.O.T. 726.687-046, with 3,000 jobs in Missouri and 120,000 in the nation (Tr. at 44). However, this would only be if the person could constantly use her hands (as opposed to frequent use as suggested by the ALJ) (Tr. at 46-47). The constant use of hands in a sedentary job is essential (Tr. at 45).

The third hypothetical was the same as the second except the person needed to alternate between sitting and standing every 30 minutes (Tr. at 44). The vocational expert testified that both the assembly line fabricator job and the wafer breaker job could be done with a sit-stand option (Tr. at 44).

The fourth hypothetical was the same as the third except the person must take occasional unscheduled breaks due to pain and a need to lie down (Tr. at 44). The vocational expert testified that such a person could not work (Tr. at 44).

The vocational expert testified that any person with a global assessment of functioning of 45 would not be able to work (Tr. at 46).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Michael Mance entered his opinion on March 26, 2009 (Tr. at 8-20).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 10).

Step two.  Plaintiff's severe impairments include degenerative disc disease, degenerative joint disease, obesity, depression, and migraines (Tr. at 10).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform light work except she can never climb ropes, ladders, or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch or crawl; can frequently handle and reach in all directions including overhead;  must avoid concentrated exposure to extreme heat or cold, wetness, humidity, vibration, industrial hazards, and heights; and is limited to performing simple tasks (Tr. at 15-16).  With this residual functional capacity, plaintiff can perform her past relevant work as a cashier (Tr. at 19).

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations

27

by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In the Disability Report, the claimant's alleged impairments included a fractured right knee, mild broad bulge in the back, spurring, inflammation of the upper back; her back was in and out of place; she had constant headaches; both wrists swell along with her fingers; nerve damage in her back; both knees crack, pop, and hurt because they were sprained and the right one was fractured; and she had severe aching pain in her mid and lower back.  The claimant stated that she was

in constant pain. She could not sit or stand while doing a job. Using her hands caused her fingers to swell. She had migraines. She was severely depressed because of her conditions. The claimant stated that she was injured December 5, 2006 and stopped working December 24, 2006. Her doctor took her off work. She tried to work afterward, but could not continue.

At the hearing, the claimant testified that she fell and hurt herself in the bathroom at work. She hurt both knees, both wrists, her low back, and her shoulders. She did not know what the x-rays found. They sent her to a doctor. She was told that she had fractured her right knee and had spurs on her spine. They put wrist restraints on both wrists and a long knee restraint. Her entire back bothered her from neck to tail bone. She had muscle spasms in her upper back and shoulders. Both the Administrative Law Judge and the claimant's attorney agreed that there was no report of a fractured knee. . . .

In terms of the claimant's alleged fractured right knee and sprained left knee, when seen in the ER after her December 5, 2006 fall, there were contusions on her left knee. X-rays of the right knee were negative. The clinical impression included contusions to the knee from a fall. The work status report diagnosis was contusion to the right knee. A 2007 MRI of the right knee revealed a small joint effusion, but no other injury to the right knee. In November 2007, the claimant refused a lower extremity EMG test. In February 2008, she told the neurologist of having had a fracture of the right knee, which did not require surgery. She complained of diffuse knee pain. Her physical exam and neurological exam were unremarkable. In March 2008, she told Dr. Froncek of having a difficult time with strength in her lower extremities. Her physical exam was unremarkable. The assessment was lower extremity pain, questionable neuropathy with ongoing work up by a neurologist; lower extremity pain for which she asked for an opinion regarding her leg pain. In April 2008, Dr. Frock [sic] agreed with the assessment of Dr. Abbott that the claimant would be able to have a job where she sat at a cash register and lifted less than five pounds. In November 2008, the claimant established care with Dr. Shen. Her exam was unremarkable. It is further noted that, when seen in the ER in December 2006, the claimant had contusions on her left hand. Left wrist x-rays were negative. Left-hand x-

rays found no evidence of fracture. The clinical impression was contusions to the wrist and hand. A November 2007 EMG and nerve conduction study of the right arm was normal. Although she complained of upper extremity pain and tingling to the neurologist, her exam was unremarkable.

* * * * *

In terms of the claimant's alleged Graves' disease, tumors everywhere inside her body, sleep apnea, and neuropathy from the waist down, these conditions were mentioned in the medical records. The first mention of stomach tumors and thyroid condition was during the 2007 consultative psychological evaluation. In February 2008, Dr. Froncek included hypothyroidism in his assessment. The claimant told the neurologist of her hypothyroidism and her history of Graves' disease. She had no other medical problems, except migraines for the past two years. Her physical exam and neurological exam were unremarkable. The specialist believed the claimant's hypothyroidism needed to be adequately controlled in order to avoid development of related medical conditions such as weight gain, sleep apnea, peripheral neuropathy, etc. During an April 2008 thyroid check, the claimant's other significant concern was possible sleep apnea. The assessment included witnessed apneic episodes at night, questionable sleep apnea, and hypothyroidism. An April 2008 sleep study revealed mild to moderate obstructive sleep apnea/hypoxia. She required a CPAP machine. However, she did not return for further studies to determine the CPAP needed. Her history of neurofibromatosis and removal of a 9.7 pound stomach tumor were not mentioned by any physician or the claimant until November 2008. Dr. Shen only noted that the claimant had an abdominal surgical scar consistent with her history. Otherwise, her exam was unremarkable. The claimant's thyroid condition was treated, but control was questionable. She had been diagnosed with moderate obstructive sleep apnea, but had not returned for completion of the tests. Her history of neurofibromatosis and a 9.7 pound stomach tumor were not mentioned until the claimant did so to Dr. Shen in November 2008. There was no evidence of any limitation in the claimant's physical or mental activities due to any of these alleged impairments.

* * * * *

30

Overall, objective testing has not been that bad.  At the
hearing, the claimant testified that she fractured her knee
when she was injured on her alleged onset date.  Again,
there is no record of that.  Her representative admitted
there were no records to support such a finding.  Overall, I
find that the claimant is not credible.  She seems to
exaggerate everything.  Following the September 2007
psychological consultative evaluation for the state welfare
office, the psychologist noted that the claimant also may
possibly be a hypochondriac.  It was unknown that all
reported medical problems were actually real and could be
confirmed by a physician.  In March 2008, the claimant told
Dr. Froncek that she had talked to her attorney and he asked
for a physician's evaluation or rating of her pain.  In
April 2008, Dr. Froncek noted that occupational specialist
Dr. Abbott had the patient returning to work in a seated
cashier's position lifting less than five pounds.  The
patient was subsequently discharged for lack of follow-up.
Dr. Froncek noted that the claimant wholeheartedly refused
physical therapy.  When he suggested she try working, she
was reluctant and resistant to that suggestion.  She became
quite anxious upon hearing that his assessment would be that
she could work.  It is again noted that the records of Dr.
Abbott were not introduced into evidence as part of the
documentary record in this case.

When the claimant again saw Dr. Froncek on April 25, 2008,
she wanted a workers compensation rating that day, stating
that, if she did not get the rating today, she would find a
new physician.  He offered a referral to a specialist.  Dr.
Froncek explained to the claimant that he would not give her
a rating, but would be more than happy to describe her
illness or situation.  He again stated that a disability
rating needed to be done by a specialist.  The claimant
again stated that, if she did not get a rating at that
appointment, she would seek another physician.  The claimant
refused adamantly physical therapy and EMG testing.  She
reportedly had an appointment with a Dr. Mace for an
evaluation, but refused to be seen by the doctor as she
disagreed with the payment mechanism by which Dr. Mace would
receive a percentage of the disability she received.  Dr.
Froncek noted that no arrangements were made for follow-up,
as the claimant stated she would be establishing care with a
new physician.  In addition, the claimant refused a refill
of the pain patch stating that only Oxycontin helped her
pain.  The doctor refused to prescription [sic] that

medication, stating that she needed to see a pain management specialist.

When she returned to the neurologist in June 2008, the claimant reported that her primary care physician Dr. Froncek fired her because she was taking excessive amounts of Lyrica and put on weight. In addition, when the claimant established care with Dr. Shen, she stated that she was no longer seeing her previous physician over a misunderstanding regarding the disability score. This was an understatement as Dr. Froncek repeated noted that she threatened to quit his practice if he did not provide her a disability rating for injuries received on December 5, 2006. Furthermore, the claimant has a workers compensation claim pending, which has yet to be settled. Overall, the claimant's credibility was severely undermined by her contradictory statements and her demands for a disability rating.

**1. *PRIOR WORK RECORD***

The evidence shows that plaintiff had a sporadic work history. During a five-year period, plaintiff earned a total of $31.75. During the first 19 years of her employment history, plaintiff earned $29,464.62, or an average of only $1,550 per year for nearly two decades. This factor supports the ALJ's credibility finding.

**2. *DAILY ACTIVITIES***

Plaintiff testified that even using her hand to open a door caused it to swell. Yet, she also reported that she talks on the phone as part of her typical day, indicating that plaintiff is capable of holding a phone. She claimed in her administrative paperwork that she writes herself notes to remember - which indicates that she is able to hold and operate a pen or pencil.

These inconsistencies in plaintiff's allegations support the ALJ's finding that her complaints are not credible.

**3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

In February 2008 plaintiff's doctor noted that her migraines had been under control for the last two years, which would be before her alleged onset date.  Plaintiff "wholeheartedly" refused to participate in physical therapy, she failed to follow up for treatment after her sleep study, she refused any pain reliever other than an addictive narcotic, and she refused to see a nutritionist about her morbid obesity even though her doctor believed that was causing her osteoarthritis for which she was seeking disability.  In February 2008 plaintiff took herself off a Duragesic patch even though that caused her symptoms to increase.  In April 2008 plaintiff was taking her Lyrica "as needed" when it was supposed to be taken regularly to prevent pain.  In June 2008, plaintiff was supposed to be taking Topamax for migraine prevention, but was not.  She stopped taking her thyroid medication even though her thyroid problems were causing the main condition which resulted in her symptoms, according to Dr. Sivaraman.  In November 2008 plaintiff was taking only 1/6 of the pain medicine that had been prescribed.  Plaintiff admitted that she was able to get her medicine as needed because she was on Medicaid.

All of this evidence establishes not only that plaintiff's symptoms were not nearly as bad as she alleged, but that she may have been attempting to worsen her own symptoms in order to bolster her disability and worker's compensation cases. This factor very strongly supports the ALJ's credibility finding.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

There is no significant evidence of observations by third parties or treating or examining physicians regarding precipitating or aggravating factors.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

As mentioned above, plaintiff took herself off the Duragesic patch without consulting her doctor even though she claimed her pain and discomfort increased as a result; she took Lyrica as needed instead of regularly as prescribed; she refused to accept a prescription for any medication other than an addictive narcotic; she stopped taking her thyroid medication against medical advice; and she took only 1/6 of the pain medicine she had been told by her treating doctor to take. The evidence establishes that when plaintiff took her medication as directed, her symptoms were controlled. Failure to follow prescribed treatment without good reason is grounds for denying benefits. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). This factor strongly supports the ALJ's credibility finding.

### 6. *FUNCTIONAL RESTRICTIONS*

Plaintiff's treating physician believed that plaintiff could work in a seated position lifting five pounds or less. Although plaintiff claimed she could not reach above her head, she wrote in an administrative form that every day she puts her hair in a ponytail, which requires one to raise her arms above her head. Additionally, she never complained to any doctor about an inability to raise her arms over her head, and no doctor ever observed such a difficulty. There is no evidence that any doctor placed any functional restrictions on plaintiff.

### B. *CREDIBILITY CONCLUSION*

In addition to the above factors, I note, as did the ALJ, that plaintiff's medical exams were essentially normal. The fall in December 2006 resulted only in contusions, not fractures as plaintiff claimed on multiple occasions. In January 2007 she had only a small amount of fluid accumulation in her knee and no other abnormality. Her memory was within normal limits in September 2007. Her physical exam was normal is February 2008. An MRI of her cervical and lumbar spine in February 2008 did not show any abnormality that would explain her alleged symptoms. A physical exam was normal in March 2008. Her exam in April 2008 was normal. In November 2008 she had another normal exam. A neurologist noted normal sensory responses in April 2009. She

had 5/5 muscle strength and no atrophy.  She had a normal EMG study in May 2009.

The only abnormality in any of plaintiff's exams was a decreased pinprick sensation in her hands and lower legs; however, as mentioned above, plaintiff had normal sensory responses in April 2009.  There simply is nothing to support plaintiff's exaggerated claims of disabling symptoms.

In addition to her consistently normal exams, in her work history report she claimed not to be able to remember dates or rates of pay for jobs, "or even remember having" some jobs; yet she testified without difficulty at the administrative hearing about how much she had to lift at each job.  Additionally, plaintiff's long-term and short-term memory were tested and were found to be within normal limits.  Clearly plaintiff's claim of impaired memory is exaggerated.

Plaintiff has a previous arrest for writing bad checks, which suggests that she is capable of being dishonest for financial gain.

Plaintiff refused low extremity EMG testing at a time when all of her other EMG testing was normal.  Although plaintiff's doctor recommended she see a pain specialist, there is no evidence that she ever went.  Plaintiff has a history of exaggerating her condition, such as by telling multiple doctors

that she fractured her knee in December 2006 when the records from that month and the month after showed that she had nothing but a bruise and a small amount of fluid in her joint. In March 2008 plaintiff wanted nothing but a disability rating – she was not interested in treatment. This suggests that plaintiff's motivation for going to the doctor was to bolster her claims as opposed to relieving her symptoms. In February 2008 plaintiff's doctor noted that her migraines had been under control for the past two years. However, just two months later she told her doctor that her migraines were back, that they were severe, and that she needed a worker's comp rating. This suggests that plaintiff's complaint of returning migraines was to beef up her worker's comp claim as opposed to a request for treatment, especially in light of plaintiff's consistent failure to take her migraine prevention medication as directed.

Dr. Froncek questioned plaintiff's report of high blood sugar in April 2008, which again is when plaintiff was demanding a worker's comp rating from him. Although plaintiff told Dr. Froncek that she was previously totally disabled because of psychiatric symptoms, there is nothing in the record to suggest such a thing. Dr. Froncek, plaintiff's treating doctor, questioned whether plaintiff was exaggerating her pain due to her pending cases. He believed plaintiff should try working, however

she was "reluctant" and "resistant" to working.

Plaintiff threatened to fire Dr. Froncek as her treating physician if he did not give her a worker's comp rating. She also implied that she could get a rating from him and appear before judges "feigning illness."

Two weeks after refusing pain medication because it was not OxyContin, plaintiff tried to get hydrocodone from a new doctor. He refused to prescribe it, instead giving her a muscle relaxer. Plaintiff lied to Dr. Sivaraman about why she stopped seeing Dr. Froncek.

In July 2008 plaintiff had been off her cholesterol-lowering medication for a "long time." In November 2008 she was supposed to be taking 600 mg of Lyrica per day but was only taking 100 mg. This is despite plaintiff having Medicaid and indicating that she was able to get her medications.

She refused a muscle EMG in May 2009 which meant the doctor could not diagnose her.

Plaintiff never complained of her fingers swelling to any doctor. Swollen fingers were never observed by any treating source nor was plaintiff ever diagnosed with or treated for swelling fingers.

Plaintiff testified that even air hurts her knees; however, she took herself off her pain patch, she took 1/6 of the

prescribed dose of pain medication, and she refused any pain medication other than an addictive narcotic.  In addition, she refused to go to a pain specialist even though her doctor told her that only a pain specialist could prescribe the narcotic plaintiff wanted.

Plaintiff testified that she must hold onto something while standing or she would fall.  However, plaintiff was consistently observed to have a normal gait, and she never told any doctor about a need to hold onto things or a problem with falling.

Clearly the evidence in the record overwhelmingly supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII. STATEMENTS BY DR. ADELMAN

Plaintiff argues that the ALJ did not address the GAF of 45, when the vocational expert testified that a person with a GAF of 45 could not work, and the ALJ did not address Dr. Adelman's statement that plaintiff "did perceive pain" and it "appeared that this pain impaired her and kept her from working."

Only one time in the record is a GAF of 45 mentioned – on September 13, 2007, by Dr. Adelman who saw plaintiff in connection with a claim for benefits.  Dr. Adelman described the mental status exam as follows:

> Her appearance was neat and clean.  Her clothing was
> appropriate.  Her facial expressions appeared to be

39

adequate. Her eye contact was good. She had the ability to
relate. She appeared to be of some emotional distress. She
was alert and orientated to time, place, person and
situation. Her speech was clear, logical and coherent. The
rate was normal. Her thought processes appeared to be
within normal limits; however, she gets confused easily and
does not understand what people mean at times when they are
talking to her. Her thought content does contain some
auditory hallucinations and she is very afraid of the dark.

Her affect appeared to be within normal limits. Her anxiety
is situational and she scratches when she is nervous. Her
mood appeared to be mild to moderately depressed. She does
not sleep well. Her appetite is low and her energy level is
low. She has crying spells and she does have suicidal
ideations.

Her abstract thinking appears to be adequate. She was able
to tell me the meaning of several proverbs and abstractions.
Her memory functions appear to be within normal limits. She
was able to tell me at least two out of three words told to
her approximately half an hour later. She was able to do
six digits forward and four digits in reverse in digit span.

Her social judgment appears to be adequate.

Her long-term memory appears to be adequate; however, she
appears to be in the low average range of intelligence. Her
math skills appear to be adequate. She is capable of
managing her own funds.

(Tr. at 283).

In order to analyze the basis for a global assessment of

functioning of 45 (since the above is the ONLY basis in Dr.

Adelman's record other than plaintiff's subjective reports), I

will divide the mental status exam findings into two categories:

normal and abnormal.

Normal.

- Her appearance was neat and clean.

40

- Her clothing was appropriate.

- Her facial expressions appeared to be adequate.

- Her eye contact was good.

- She had the ability to relate.

- She was alert and orientated to time, place, person and situation.

- Her speech was clear, logical and coherent.  The rate was normal.

- Her thought processes appeared to be within normal limits.

- Her affect appeared to be within normal limits.

- Her anxiety is situational

- Her abstract thinking appears to be adequate.

- Her memory functions appear to be within normal limits.

- Her social judgment appears to be adequate.

- Her long-term memory appears to be adequate.

- Her math skills appear to be adequate.

    <u>Abnormal</u>.

- She appeared to be of some emotional distress.

- She gets confused easily and does not understand what people mean at times when they are talking to her.

- Her thought content does contain some auditory hallucinations.

- She is very afraid of the dark.

- She scratches when she is nervous.

- Her mood appeared to be mild to moderately depressed.

- She does not sleep well.

- Her appetite is low and her energy level is low.

- She has crying spells.

- She has suicidal ideations.

It is unclear whether Dr. Adelman's comment about plaintiff getting confused easily and not understanding what people mean when they are talking to her came from his own observation or from plaintiff's complaint. Since there is no other observation by any other doctor or nurse of a problem with confusion or failing to understand, it appears that this is a recitation of plaintiff's report as opposed to something Dr. Adelman observed. In addition, the other "findings" in this mental status exam were simply a recitation of plaintiff's report (such as hallucinations, inability to sleep, poor appetite, crying spells, etc.)

Plaintiff never told any other doctor about auditory hallucinations.

Although plaintiff indicated she does not sleep well, she refused to follow up on treatment for sleep apnea.

Although plaintiff reported that her appetite was low, she was morbidly obese and refused to see a nutritionist as suggested by her treating doctor.

Plaintiff never reported crying spells or suicidal ideation to any doctor, nor did she ever seek treatment for these

symptoms.  The absence of any evidence of ongoing counseling or psychiatric treatment supports a finding that a claimant is not disabled.  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

There is no evidence that being afraid of the dark or scratching when nervous would interfere with plaintiff's ability to work.

A GAF of 45 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  This does not describe plaintiff's condition on any doctor visit other than the one with Dr. Adelman which was in furtherance of an application for benefits as opposed to for treatment of her symptoms.  See Tr. at 180, 202, 230, 253, and 283 where plaintiff was observed to have normal mood, affect, judgement, insight, and memory.

An ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it. Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010); Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003).  In addition, the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs.  "The GAF scale, which is described in the DSM-III-R (and the DSM-IV),

is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings." 65 F.R. 50746-01.

Finally, the ALJ is not required to address every single sentence or phrase in every medical record. When an ALJ specifically references findings of a medical source, the court can assume the ALJ considered the medical source's opinion. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) ("Given the ALJ's specific references to findings set forth in Dr. Michaelson's notes, we find it highly unlikely that the ALJ did not consider and reject Dr. Michaelson's statement that Wildman was markedly limited"). The fact that Dr. Adelman believed plaintiff felt pain and that her pain apparently kept her from working is not supportive of plaintiff's credibility -- had plaintiff been in this much pain, it is unlikely she would have taken herself of a Duragesic patch, taken 1/6 of her daily dose of pain medication, refused any prescription other than the one she wanted, refused to go to a pain specialist, etc.

Plaintiff admitted that she had never sought mental health treatment and the medical evidence consistently revealed normal to mild mental status examinations. Therefore, the ALJ properly evaluated the evidence related to plaintiff's depression and

concluded that although it imposed some limitations on her ability to function, it was not completely disabling.

The evidence as a whole supports the ALJ's decision not to rely on the above statements by Dr. Adelman.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 28, 2011